UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

THE STATE OF NEW YORK,

           Plaintiff,

       -vs-

SOLVENT CHEMICAL COMPANY, INC., and          83-CV-1401-JTC
ICC INDUSTRIES, INC.,

           Defendants/Third-Party Plaintiffs,

       -vs-

OLIN CORPORATION and
E.I. du PONT de NEMOURS & COMPANY,

           Third-Party Defendants.

---

On January 26, 2010, following years of protracted litigation and a lengthy non-jury trial, this court issued a Memorandum of Decision incorporating its findings of fact and conclusions of law on the issues pertaining to liability and equitable allocation of responsibility for response costs incurred in remediating environmental contamination at adjoining industrial sites located in Niagara Falls, New York, pursuant to the Comprehensive Environmental Response and Compensation Act ("CERCLA"), 42 U.S.C. §§ 9601–9675.  *New York v. Solvent Chemical Co., Inc.*, 685 F. Supp. 2d 357 (W.D.N.Y. 2010).  The court awarded third-party plaintiff Solvent Chemical Company, Inc. ("Solvent") contribution from third-party defendant E.I. du Pont de Nemours & Company ("DuPont") in the amount of $2,050,371, and from third-party defendant Olin Corporation ("Olin") in the amount of $462,288, for past costs associated with the remediation of contaminated soil

and groundwater at Solvent's facility located at 3163 Buffalo Avenue (the "Solvent Site"), and groundwater contamination at a portion of Olin's neighboring property known as the "Olin Hot Spot." The court denied Solvent's request for declaratory judgment as to liability for future cleanup costs, determining upon consideration of the equitable factors "that final judgment regarding the allocation of future costs to any party other than Solvent would be premature." *Id.* at 455-56. Judgment was entered on May 14, 2010 (Item 1547), and all parties appealed.

On December 19, 2011, the Second Circuit Court of Appeals entered separately (1) an Opinion and (2) a Summary Order constituting its ruling on the parties' appeals. *New York v. Solvent Chemical Co., Inc.*, 664 F.3d 22 (2d Cir. 2011) ("Opinion"); *New York v. Solvent Chemical Co., Inc.*, 453 F.App'x 42 (2d Cir. 2011) ("Summary Order"). The ruling vacated this court's allocation of response costs as between Solvent, DuPont, and Olin with respect to the Olin Hot Spot, and reversed the judgment insofar as this court declined to issue a declaratory judgment in favor of Solvent against DuPont and Olin as to liability for recovery of future response costs. The ruling affirmed this court's findings of fact and conclusions of law in all other respects, and remanded only for reallocation of response costs for the Olin Hot Spot and entry of declaratory judgment in favor of Solvent on liability for future response costs.

In the wake of this ruling, a status conference was held with counsel on February 15, 2012 to discuss the parties' respective positions regarding an appropriate way to address the matters necessary for compliance with the Second Circuit's directives on remand. Failing to reach a consensus, the parties were ordered to submit written proposals, which the court has now had the opportunity to consider.

Upon full consideration of the Second Circuit's Opinion and Summary Order, and for the reasons discussed below, the court finds that those portions of its January 26, 2010 findings of fact and conclusions of law that were either expressly affirmed or undisturbed on appeal remain binding on the parties, and provide a solid basis for both reallocation of responsibility at the Olin Hot Spot and entry of declaratory judgment in favor of Solvent regarding equitable allocation of ongoing remediation costs.  This can be done without resort to additional discovery, presentation of evidence, briefing, argument, or other wasteful re-visitation of issues that have been exhaustively litigated during years of pretrial proceedings, lengthy trial on the merits, and on appeal.  Accordingly, in the interests of economy of public and private resources, judicial efficiency, and finality, the court turns to the record as it stands for compliance with the directives on remand.

To recap, in its decision after trial, this court found DuPont and Olin liable for contribution under CERCLA § 113(f) for an equitable share of response costs incurred by Solvent to remediate contamination at both the Solvent Site and the Olin Hot Spot by virtue of the migration of hazardous substances to both areas from the DuPont and Olin facilities. *Solvent Chemical*, 685 F. Supp. 2d at 430-38.  The court then adopted, with certain modifications, the volumetric allocation methodology proposed by Solvent's allocation expert, James Kohanek, and allocated responsibility among the three parties for costs incurred through the agreed upon date of June 30, 2007 for each of the four separate components of the remediation–the contaminated soils at the Solvent Site; the shallow overburden (or "A–Zone") groundwater contamination at the Solvent Site; the bedrock (or "B–Zone") groundwater contamination at the Solvent Site; and the groundwater

contamination at the Hot Spot.[1]  The court dismissed Solvent's claim for a declaratory judgment against both DuPont and Olin with respect to remediation costs incurred after June 30, 2007, finding upon consideration of "key equitable factors" that "final judgment regarding the allocation of future costs to any party other than Solvent would be premature." *Id.* at 455–56.

The parties each appealed different aspects of this court's findings of fact and conclusions of law.  For its part, Solvent appealed the denial of the request for a declaratory judgment and the allocation of costs incurred at the Olin Hot Spot.  DuPont appealed the court's ruling on certain discrete issues regarding threshold contribution liability under CERCLA, and the court's failure to consider toxicity as a factor in determining the groundwater allocation.  Olin challenged certain issues related to the court's allocation of responsibility for costs incurred in connection with the cleanup of Gill Creek.  Significantly, neither DuPont nor Olin appealed this court's adoption of Mr. Kohanek's volumetric-based allocation methodology, or for that matter, any of the court's factual findings or evidentiary rulings with respect to hydrogeology and groundwater migration pathways between the various facilities.  *See* Item 1566, pp. 2-4.

In its December 19, 2011 Opinion and Summary Order, the Second Circuit sustained both of Solvent's arguments on appeal, while rejecting all of the arguments raised by DuPont and Olin.  With respect to the claim for declaratory judgment, the circuit court found that while the equitable factors considered by this court in declining to issue

---

[1] The court also awarded Olin a judgment against Solvent for an equitable share of responsibility for response costs incurred in remediating a portion of the contaminated sediments in Gill Creek, *Solvent Chemical*, 685 F. Supp. 2d at 453-54, but it dismissed Olin's claim against Solvent's parent corporation, ICC Industries, Inc., for these same costs.  *Id.* at 439-42.

a final judgment might justify a refusal to allocate future cleanup responsibility, they did not support the refusal to grant declaratory judgment as to liability itself. The Second Circuit stated:

> The district court has already decided that Olin and DuPont were liable for contribution as to historical losses. Save for the possibility that the DEC might in the future impose different remedies to clean up the chlorinated aliphatics, none of the factors identified by the court distinguishes between past and future cleanup. That is to say, the factors do not explain why DuPont and Olin should pay for cleanup costs through June 30, 2007, but not for those incurred on July 1, 2007 and thereafter. And should the DEC take action in the future regarding chlorinated aliphatics, the district court can consider that fact in allocating costs down the road. Even concern over the future role of chlorinated aliphatics in the ongoing cleanup would not affect Olin's responsibility to contribute to cleanup costs based on its discharge of chlorinated benzenes.

Opinion, 664 F.3d at 26. Upon considering the factors for determining whether to issue a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201(a), the circuit court found that declaratory judgment was necessary in this case for statute of limitations purposes "to ensure an equitable apportionment of cleanup costs that (as is common) are incurred over many years …," *id.* at 26-27, and because the " 'costs and time involved in relitigating issues as complex as these where new costs are incurred would be massive and wasteful.' " *Id.* at 26-27 (quoting *Boeing Co. v. Cascade Corp.*, 207 F.3d 1177, 1191 (9th Cir. 2000)).

With respect to the allocation itself, the Second Circuit found that this court did not abuse its discretion when it calculated equitable shares of responsibility for the B-Zone groundwater contamination based on the allocation framework proposed by Mr. Kohanek. The circuit court noted that, in constructing his proposal, Mr. Kohanek relied on the findings of other experts as to migration pathways and use of a "tracer" compound associated with

DuPont's plant to conclude that 68.39% of the B-Zone groundwater being remediated at the Solvent Site contained chlorinated aliphatics, and 31.61% contained chlorinated benzenes. He attributed 98% of the chlorinated aliphatic share to DuPont, and 2% to Solvent, and he attributed 98% of the chlorinated benzene share to Solvent and 2% to Olin. This court found that equitable considerations required modification of Mr. Kohanek's proposed share percentages in order to adequately account for the principal negative environmental impact of the contaminants driving the groundwater remedy–*i.e.*, chlorinated benzenes and chlorinated benzene DNAPL. The court determined that this could be accomplished by splitting the difference between the risk analysis rates as calculated by Solvent (on the basis of pumping well data) and DuPont (on the basis of monitoring well data), to arrive at adjusted relative contribution rates of 62.05% for chlorinated benzenes and 37.95% for chlorinated aliphatics. DuPont's share of the chlorinated aliphatic contamination was then discounted by 10% to further account for "the overwhelming evidence of the extensive chlorinated benzene contamination as the primary negative environmental impact driving the overall remedy at issue in this litigation," *Solvent Chemical*, 685 F. Supp. 2d at 451, resulting in the allocation of the costs associated with the B-Zone groundwater remedy at the Solvent Site at 65.98% to Solvent, 33.39% to DuPont, and 0.63% to Olin. The Second Circuit expressly rejected DuPont's challenge to this allocation on the ground that the court's adoption of Mr. Kohanek's methodology overlooked the relative toxicities of the contaminants, finding "no abuse of discretion." Summary Order, 453 F.App'x at 48.

This court again relied on Mr. Kohanek's framework to allocate the costs associated with the groundwater remedy at the Olin Hot Spot. Based primarily on the volumetric

analysis of the pumping well data, Mr. Kohanek determined that chlorinated aliphatics (for which DuPont was 100% responsible) constituted 93.52% of the contamination in the Hot Spot groundwater, and chlorinated benzenes (for which Olin was 98% responsible) constituted 6.48% of the Hot Spot groundwater contamination. He therefore proposed that DuPont bear 93.52%, Olin 6.35%, and Solvent 0.13% of the costs associated with the Hot Spot groundwater remedy. This court once again reasoned that the "overwhelming evidence of the extensive chlorinated benzene and DNAPL contamination" required modification of these percentages to reflect the same equitable considerations made with respect to the allocation of the responsibility for the costs associated with the B–Zone remedy at the Solvent Site, resulting in a "discounted relative share of 33.39%" for DuPont. *Solvent Chemical*, 685 F. Supp. 2d at 452-53. The court adopted Mr. Kohanek's proposed assessment of Olin's allocable share at 6.35%, leaving Solvent to bear 60.26% of the responsibility of the responsibility for the costs associated with the Hot Spot remedy.

The Second Circuit found inadequate support for these calculations. According to the circuit court:

> Solvent's proposal that Olin bear 6.35% of the cleanup costs for the Olin Hot Spot was premised on the view that 93.52% of the costs resulted from contamination by chlorinated aliphatics, of which DuPont was the sole producer. The district court's rejection of this view in favor of a finding that the remedy was driven primarily by contamination from chlorinated benzenes—which both Olin and Solvent produced—therefore removes the foundation for the 6.35% figure. Moreover, the district court should not, without further explanation, have borrowed for its Hot Spot findings the same percentage of responsibility it had allocated to DuPont for B–Zone contamination at the Solvent Site. There was substantial dispute about the nature and extent of contamination at the Hot Spot, as well as about the similarity (or lack thereof) between the contamination at the Hot Spot and at the Solvent Site. Absent resolution of at least some of these issues, the district court's use of its allocation at the Solvent Site in allocating costs for the Hot Spot is not supported. Although the district court was disserved by

>the "parties' inability to reach any workable consensus as to the reasonable scientific conclusions" to be drawn from the evidence, the finding made nevertheless lacks support.

Summary Order, 453 F.App'x at 49 (quoting *Solvent*, 685 F. Supp. 2d at 452). The circuit court therefore vacated this court's allocation of response costs for the Olin Hot Spot, and remanded "to reallocate response for the Olin Hot Spot and to enter a declaratory judgment in favor of Solvent not inconsistent with this order." *Id.*

The court now turns to the task at hand, based on the existing record and the prior findings of fact, conclusions of law, and evidentiary rulings that were either expressly affirmed or left undisturbed by the Second Circuit.

## I.   Olin Hot Spot Reallocation

Considering the extensive testimony and exhibits presented at trial with respect to the underlying hydrogeology, groundwater chemistry, and migratory pathways in the area of concern, this court finds that the proper allocation of responsibility for the Olin Hot Spot groundwater remedy can be readily calculated without resort to additional fact or expert discovery, testimony, briefing, or argument. To reiterate, this court's undisturbed findings establish that none of the contamination detected in the groundwater at the Olin Hot Spot was derived from materials transported to, stored, handled or released at the Hot Spot by any of the three remaining parties; rather, all of the chlorinated benzene and chlorinated aliphatic contamination detected at the Hot Spot has migrated there (*see Solvent Chemical*, 685 F. Supp. 2d at 436); all of the chlorinated aliphatic contamination at the Hot Spot is attributable to DuPont (*id.* at 431-432, 451); the overall groundwater flow pattern in the area of concern in both the A- and B-Zones is in a general southwest-to-northeast

direction, indicating a migratory pathway from the Olin ARGC area (where Olin historically manufactured benzene hexachloride ("BHC") and released large amounts of chlorinated benzenes into the environment) to the Hot Spot (*id.* at 437-38); the top of bedrock elevations underlying the Olin facility indicate a pathway for Olin chlorinated benzene DNAPL to migrate from the ARGC Area to the Hot Spot (*id.*); additional contaminants associated only with Olin's operations (BHC and perchlorate) have been detected in the monitoring wells at the Hot Spot (*id.*); and, Olin is the current owner of the property on which the Hot Spot is located (*id.* at 434). There is nothing in the Second Circuit's rulings on appeal that would cause this court to revisit these findings.

These same findings establish that no similar pathways exist for the migration of chlorinated benzenes or chlorinated benzene DNAPL from the Solvent Site to the Olin Hot Spot. Specifically, the Solvent Site is immediately east of the Hot Spot (*see* Exhibit S-6017); the prevailing flow of groundwater is from southwest to northeast (*i.e.*, from the ARGC Area to the Hot Spot; *see Solvent Chemical*, 685 F. Supp. 2d at 437-38); and the top of bedrock elevations are generally higher at the Hot Spot than at the Solvent Site (*see id.* at 437). Based on these findings, undisturbed on appeal, the conclusion can be drawn that chlorinated benzene contamination in the A- and B-Zone groundwater beneath the Solvent Site migrates away from the Olin Hot Spot, and chlorinated benzene DNAPL at the Solvent Site could not have migrated along the top of bedrock from the Solvent Site to the Olin Hot Spot.

Similarly undisturbed is this court's reliance on Mr. Kohanek's volumetric allocation framework, as well as the modification of his proposed share percentages by averaging

pumping well data with monitoring well data. The circuit court did express concern about the lack of foundation for assigning the same percentage for DuPont's allocable share of responsibility for the Hot Spot remediation that it had assigned to DuPont for B–Zone contamination at the Solvent Site. However, this concern can be substantially alleviated on reallocation by eliminating the 10% discount assessed in DuPont's favor for the Solvent Site B-Zone groundwater remedy to account for the "primary negative environmental impact" of chlorinated benzene contamination. *Solvent Chemical*, 685 F. Supp. 2d at 451. Notwithstanding the proof at trial regarding the DEC's underlying rationale for requiring hydraulic control at the Hot Spot as a component of the overall integrated B–Zone remedy–*i.e.*, that the chlorinated benzenes found at the Hot Spot were similar to the "predominant site indicator chemicals" driving the remedy which were "likely due in part to migration from the Solvent Site" (*id.* at 452) (quoting Solvent ROD, S–1012 at p. 20)–the record is also clear that Solvent never owned or operated any portion of the Olin property, and therefore cannot be responsible for any direct releases of hazardous substances at the Hot Spot. This court's undisturbed findings further establish that all of the contamination at the Olin Hot Spot migrated there from off-site due to past industrial operations (*see id.* at 431-32, 435-36), and that at least as much source contamination (in the form of chlorinated aliphatics DNAPL) exists at the DuPont facility and (in the form of chlorinated benzene DNAPL) at Olin's ARGC area as exists at the Solvent Site (*id.* at 437-38). It is also beyond dispute that a substantial portion of the contamination in the groundwater pumped from the B-Zone at the Hot Spot consists of DuPont-related chlorinated aliphatics (*see, e.g.*, *id.* at 452). Considering this court's factual findings

regarding prevailing groundwater flow direction and other potential migration pathways, it would be inequitable to discount DuPont's share of response cost liability at the Olin Hot Spot based on the existence of chlorinated benzene contamination at the Solvent Site that, in all likelihood, could not have migrated to the Hot Spot.

Based on these findings, and adhering to the equitably modified volumetric allocation framework, DuPont's responsibility for the groundwater contamination at the Olin Hot Spot can be fairly reallocated by averaging the Hot Spot pumping well data, indicating that 93.52% of the contaminants being pumped from the groundwater at the Hot Spot are chlorinated aliphatics, with the monitoring well data, indicating that 7.5% of the groundwater contamination at the Hot Spot consists of chlorinated aliphatics. Averaging these two figures ($(93.52 + 7.5) \times .5 = 50.51$) results in recalculation of the chlorinated aliphatics share of the groundwater contamination at the Olin Hot Spot, for which DuPont is 100% responsible, at 50.51%. The remaining 49.49% of the Hot Spot groundwater contamination is attributable to chlorinated benzenes.

The same unchallenged findings discussed above likewise support the adoption of Mr. Kohanek's proposal to assess Olin a 98% share of responsibility for the chlorinated benzene contamination at the Hot Spot. *See id.* at 452. To reiterate, the court's undisturbed factual findings regarding groundwater flow patterns, bedrock elevations, and tracer chemicals establish that, while both Olin and Solvent were responsible for significant releases of chlorinated benzenes at their respective facilities, much of the chlorinated benzene contamination being remediated at the Olin Hot Spot originated from Olin's ARGC Area, where Olin had conducted its BHC operations and where site investigations have consistently confirmed the continuing presence of significant levels of BHC,

trichlorobenzene, and other chlorinated benzenes in the soils and groundwater (*see id.* at 437-38).  As discussed above, the fact that the predominant direction of groundwater flow and the general slope of the top of bedrock is towards the northeast support the reasonable conclusion the Olin ARGC Area, and not the Solvent Site, is the primary source of the chlorinated benzene contamination at the Olin Hot Spot.

Accordingly, Olin's allocable share of responsibility for response costs incurred in remediating the groundwater contamination at the Olin Hot Spot is assessed at 48.50% (49.49% x .98 = 48.50%) of the chlorinated benzene share, leaving Solvent with 0.99% of the chlorinated benzene share (49.49% x .02 = 0.99%).  This would result in a final Hot Spot reallocation as follows:

| | |
|---|---|
| DuPont | 50.51% |
| Olin | 48.50% |
| Solvent | 0.99% |
| | 100.00% |

## II.   Declaratory Judgment

As discussed above, the circuit court found that this court abused its discretion by refusing to issue a declaratory judgment in favor of Solvent as to liability for future response costs.[2]  The circuit court determined that a declaratory judgment was necessary to ensure equitable apportionment of cleanup costs incurred on July 1, 2007 and

---

[2] Future costs will involve remediation of B-Zone groundwater contamination at the Solvent Site and Hot Spot.  The court allocated 100% of the A-Zone groundwater contamination costs to Solvent, and there are currently no future costs with respect to the Solvent Site soil remedy.

thereafter, and because of the "massive and wasteful" cost of relitigation in the absence of such a judgment. Opinion, 664 F.3d at 27.

In light of the circuit's clear expression of disfavor toward revisiting complex issues that have been exhaustively litigated over many years, and considering the extensive findings of fact and conclusions of law that have been either expressly affirmed or undisturbed on appeal, the court finds that the declaratory judgment should include a method for allocating future costs on the same basis as the allocation of past costs, and can be entered on the basis of the current record. *See City of Wichita, Kansas v. Trustees of the APCO Oil Corp. Liquidating Trust*, 306 F. Supp. 2d 1040, 1117, 1120 (D. Kansas 2003) (entering declaratory judgment as to liability for future costs of groundwater remediation, to be allocated on the same basis as past costs).

As proposed by Solvent, response costs incurred for groundwater remediation from July 1, 2007 to December 31, 2011 ("Past Future Costs") are to be allocated in the same manner as the court previously allocated past costs for the Solvent Site B-Zone, and by this order, reallocated past costs for the Olin Hot Spot. Response costs incurred for the Solvent Site B-Zone and Hot Spot groundwater remediation after December 31, 2011 ("Future Future Costs") are to be allocated based upon recalculation of the Kohanek allocation framework averaging new groundwater pumped well and monitor well data gathered twice a year. In the court's view, adopting this common sense approach will allow for equitable allocation of the parties' responsibility for response costs in proportion to their respective contributions to the harm being addressed by the remedy on a continuing basis, while limiting future proceedings to the minimum necessary to achieve this end.

Further in line with Solvent's proposal, documentation of Past Future Costs incurred by Solvent since July 1, 2007 shall be provided to Olin and DuPont by affidavit of Mr. Paul Hughes, the same witness who presented Solvent's remediation costs at trial.  These costs are to be aggregated into the same categories of remedial tasks applicable to the Solvent Site B-Zone and Hot Spot as set forth in Solvent's Proposed Findings of Fact (*see* Item 1461, ¶¶ 432-448), and as incorporated in this court's January 26, 2010 findings of fact and conclusions of law.  Mr. Hughes shall be made available for deposition regarding the documented costs, upon demonstration of good cause in a written application to this court.

With regard to Future Future Costs, Solvent shall provide DuPont and Olin with a calculation of the parties' respective shares biannually, along with supporting documentation, data, test results, and any other relevant information.  Reimbursement for Future Future Costs shall be provided to Solvent within 45 days (1) after DuPont and Olin receive the biannual information from Solvent, or (2) after any disputes are resolved.

## **CONCLUSION**

Based on the foregoing, and in compliance with the directives of the Second Circuit in its December 19, 2011 Opinion and Summary Order, this court makes the following rulings:

**(1)    Hot Spot Reallocation**

The court reallocates equitable shares of responsibility for response costs incurred in remediating the groundwater contamination at the Olin Hot Spot as follows:

DuPont 50.51%

Olin 48.50%

Solvent 0.99%

Within thirty days from the date of entry of this order, Solvent shall submit to DuPont and Olin a statement of the amount of past response costs incurred at the Hot Spot, adjusted by prejudgment and post-judgment interest rates. DuPont and Olin may contest these calculations upon written application to this court demonstrating good cause to do so, to be submitted within twenty days of their receipt of Solvent's statement.

**(2)     Declaratory Judgment**

Pursuant to 28 U.S.C. § 2201(a) and 42 U.S.C. § 9613(g)(2), the court issues the following declaratory judgment:

(a)     DuPont and Olin are liable for equitable shares of future response costs incurred by Solvent for the Solvent Site B-Zone and Olin Hot Spot groundwater remediation.

(b)     Past Future Costs (costs incurred by Solvent from July 1, 2007 to December 31, 2011) for the Solvent Site B-Zone groundwater and the Hot Spot groundwater shall be allocated in the same manner as the court previously allocated past costs for the Solvent Site B-Zone, and by this order, reallocated past costs for the Olin Hot Spot. Solvent shall be responsible for documenting Past Future Costs by affidavit of a suitable representative with personal knowledge and access to supporting data. The affiant shall be made available for deposition by DuPont or Olin upon demonstrating good cause in a written application to this court.

(c) Future Future Costs (costs incurred by Solvent after December 31, 2011) for the Solvent Site B-Zone groundwater and the Hot Spot groundwater shall be allocated based upon a recalculation of the Kohanek allocation framework using new groundwater data gathered twice a year.  Within 60 days after June 30th and December 31st of each year, Solvent shall serve DuPont and Olin with a calculation of the parties' respective shares of Future Future Costs, along with supporting documentation, data, test results, and any other information relevant to the calculation.  DuPont and Olin shall have the opportunity to contest Solvent's calculations upon demonstrating good cause in a written application to this court, to be submitted within twenty days of receipt of the biannual submissions.  Payment of Future Future Costs shall occur within 45 days after submission of documentation of the costs, or within 45 days after any contested costs are resolved by the court.

In accordance with the above, and at a time reasonably calculated to address the matters discussed herein, the parties shall submit to the court a joint proposal (or, in the absence of a consensus, separate proposals) for entry of final judgment by the Clerk of the Court.

So ordered.

    \s\ John T. Curtin  
    JOHN T. CURTIN  
    United States District Judge

Dated:  May 16, 2012  
p:\pending\1983\83-1401.apr24.2012